# UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | |
|---|---|
| ROBERT E. CYR,  )  | |
|    )  | |
|          Plaintiff,  )  | |
|    )  | |
| v.    )  | Docket no. 2:17-cv-00321-GZS |
|    )  | |
| HANNAFORD BROS. CO. LLC and  )  | |
| DELHAIZE AMERICA  )  | |
| TRANSPORTATION, LLC,  )  | |
|    )  | |
|    )  | |
|          Defendants.  )  | |

## ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Before the Court is Defendants' Motion for Summary Judgment (ECF No. 22) filed pursuant to Federal Rule of Civil Procedure 56. Having reviewed the record as well as the arguments submitted by counsel, the Court GRANTS IN PART and DENIES IN PART the Motion for the reasons outlined below.

## I.     LEGAL STANDARD

Generally, a party is entitled to summary judgment if, on the record before the Court, it appears "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248 (1986). An issue is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248. A "material fact" is

one that has "the potential to affect the outcome of the suit under the applicable law." Nereida-Gonzalez v. Tirado-Delgado, 990 F.2d 701, 703 (1st Cir. 1993).

The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). In determining whether this burden is met, the Court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor. Garcia-Garcia v. Costco Wholesale Corp., 878 F.3d 411, 417 (1st Cir. 2017).

Once the moving party has made this preliminary showing, the nonmoving party must "produce specific facts, in suitable evidentiary form, to establish the presence of a trial worthy issue." Triangle Trading Co., Inc. v. Robroy Indus., Inc., 200 F.3d 1, 2 (1st Cir. 1999) (quotation marks and internal ellipsis omitted). "Mere allegations, or conjecture unsupported in the record, are insufficient." Barros-Villahermosa v. United States, 642 F.3d 56, 58 (1st Cir. 2011) (quoting Rivera-Marcano v. Normeat Royal Dane Quality A/S, 998 F.2d 34, 37 (1st Cir. 1993)); see also Wilson v. Moulison N. Corp., 639 F.3d 1, 6 (1st Cir. 2011) ("A properly supported summary judgment motion cannot be defeated by conclusory allegations, improbable inferences, periphrastic circumlocutions, or rank speculation"). "As to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment for the moving party." In re Ralar Distribs., Inc., 4 F.3d 62, 67 (1st Cir. 1993).

In accordance with Local Rule 56(f) and the foregoing legal standard, the Court "constructs the following narrative from the undisputed facts as well as the disputed material facts viewed in the light most favorable to the non-movant," here, Plaintiff Robert Cyr. Ramsdell v. Huhtamaki, Inc., 992 F. Supp. 2d 1, 5 (D. Me. 2014); see also D. Me. Loc. R. 56(f) (providing that "[t]he court

shall have no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement of facts").

## II.     FACTUAL BACKGROUND

Robert Cyr began his employment with Hannaford Trucking Company ("HTC") in 1983. He worked for HTC at Distribution Center Number 1 ("DC No. 1") in various positions until 2014. That year, HTC's ownership converted HTC into a new limited liability company, Delhaize America Transportation, LLC ("DAT"), which retained Cyr as a dispatch supervisor at DC No. 1. DC No. 1 is a facility located in South Portland, Maine, that receives, stores, and delivers grocery items using commercial trucks. As a dispatch supervisor for DAT, Cyr's responsibilities included overseeing truck fleet maintenance, working with the trucks' onboard computers, and monitoring drivers' activities and hours for violations of company policy or U.S. Department of Transportation ("DOT") regulations. Cyr worked in this role until his termination by DAT on July 8, 2016.

DOT regulations limit the hours that truck drivers can work and impose record keeping requirements as to drivers' on duty time. See 49 C.F.R. § 395 *et seq*. As of 2016, DAT employed two timekeeping systems to track drivers' hours and activities: the Carrier Activity Management System ("CAMS") and the XATANET system ("XATA"). XATA was an onboard software system hardwired into each truck's engine that monitored such things as the truck's location, motion, and speed, as well as the driver's on and off duty time. CAMS was a system that DAT used to, among other things, collect XATA data from the trucks. During a trip, XATA would transmit data from the truck's engine to CAMS via the cellular network. However, trucks from DC No. 1 frequently experienced network connectivity issues, which would prevent XATA from communicating with CAMS. These connectivity problems sometimes resulted in inaccurate driver logs—which were seemingly the primary record of drivers' daily hours and activities—that

required manual correction.[1]  Among his other duties, Cyr was responsible for correcting these logs by referencing alternative sources of trip information.  One such source was a truck's XATA motion log, which continued to collect accurate trip information, including the truck's movement and speed, even without a network connection.

Beginning in 2015, a series of events occurred at DC No. 1 relevant to Cyr's termination. On October 25, 2015, Bruce Southwick became DC No. 1's general manager of operations.  In that role, he supervised the transportation manager who, in turn, supervised the dispatch supervisor.  At the time of Southwick's hiring, Cyr was the dispatch supervisor and his long-time colleague, Ron LaFlamme, was the transportation manager.  At some point in 2015, Cyr confided in LaFlamme that he did not agree with the direction of the company and was considering retiring in 2016.  Thereafter, in February 2016, Southwick initiated a conversation with Cyr about his retirement plans.  At a small group meeting, Southwick told Cyr that he had heard Cyr was planning to retire.  Cyr, then aged fifty-nine, responded by telling Southwick that he would not be retiring until he turned sixty-seven.

Following that conversation, according to Cyr, Southwick began to give Cyr the "cold shoulder" and ended one of Cyr's long-term projects without consulting him.[2]  (R. Cyr Dep. (ECF No. 23-4), PageID # 391.)  Then, in February or March 2016, Southwick convened a staff meeting regarding the need to eliminate truck drivers' speeding violations.  DAT policy prohibited drivers from exceeding seventy miles per hour even where the speed limit allowed such a speed.  At the meeting, Cyr expressed his opposition to this policy by stating that he did not want to reprimand

---

[1]  The Court refers to these driver logs throughout its recitation of the facts.  Although the process by which DAT generated and stored the logs is not entirely clear, the record suggests that CAMS automatically created them using transmitted XATA data and then served to store them.  However, the Court notes that a precise understanding of these technical details is unnecessary to rule on the present Motion.

[2]  More specifically, Cyr had been working to fix a system responsible for speed calibration issues for six months. Without consulting Cyr, Southwick decided to disable the system and avoid the calibration problem entirely.

drivers for doing something that was not illegal. Southwick responded by saying that they needed to move away from Cyr's "dinosaur age related theories." (R. Cyr Dep. at PageID # 387.)

At some point between February and April 2016, DAT terminated LaFlamme. In May 2016, Southwick decided to hire Crystal LaCourse—who had been working in the company's logistics department since 2011—as the new transportation manager. Upon hearing this news, Cyr complained to Southwick that LaCourse was not the most qualified candidate.[3] Later that month, Southwick met with Cyr to discuss concerns about Cyr's job performance. To that point in Cyr's thirty-three-year career with the company, he had never been counseled about his behavior. At the meeting, Southwick cited three incidents that he considered to be inappropriate: two post-staff-meeting interactions between Cyr and drivers regarding DAT's speeding policy, and Cyr's LaCourse comments.[4] Southwick then issued Cyr a performance improvement plan ("PIP"), which Cyr signed and did not formally appeal.

On May 20, 2016, Cyr met with Southwick and LaCourse to discuss the PIP. During this gathering, LaCourse asked Cyr if he could re-structure his schedule to work the evening shift, which would require him to be at DC No. 1 from 10:00 p.m. to 2:00 a.m. Although Cyr was officially the "evening supervisor," Cyr had moved his hours toward the daytime following LaFlamme's departure so that he could attend meetings. (LaCourse Dep. (ECF No. 24-3), PageID # 632.) LaCourse stated that she wanted him to return to evenings because the 10:00 p.m. to 2:00

---

[3] Southwick testified at his deposition that, during this exchange, Cyr made additional statements about LaCourse's gender, which could be considered derogatory. However, Cyr denies that he made these additional statements.

[4] Cyr admits that these incidents underlying the PIP occurred, but disputes Defendants' version of events as to all three. See, e.g., supra n. 3 & accompanying text (discussing Cyr's disputed LaCourse comments). On top of the dispute as to Plaintiff's LaCourse comments, the parties dispute: (1) whether Cyr warned driver Joe Holmes that he could be fired through the step process if he continued to speed or merely threatened to fire him if he did so; and (2) whether Cyr stood in front of the door of his office during a meeting with driver Melinda Harris in a way that was physically intimidating or otherwise inappropriate under the circumstances.

a.m. period was the busiest of the day and because DAT was hiring new drivers who needed to be trained.[5] Cyr complied with LaCourse's request. However, he complained to Southwick that this effectively cut him out of Tuesday morning safety meetings for which he continued to call in. On May 25 or 26, Cyr met with Melissa Cyr ("Ms. Cyr" or "Melissa")[6] of DAT's human resources department to discuss the PIP. At that time, Cyr expressed his belief to Melissa that Southwick targeted him for the PIP because of his age.

During May and June 2016, while Cyr was still subject to the PIP, DAT's transportation safety and compliance manager, Paul K. Harrill, conducted a companywide audit of drivers' DOT hours of service compliance. Harrill worked at the company's headquarters in North Carolina and neither LaCourse nor Southwick had anything to do with initiating the audit. As part of the audit, Harrill reviewed the "driver log edit detail report," which recorded any edits made to the driver logs in DAT's system. (Harrill Dep. (ECF No. 24), PageID # 582.) Harrill searched the report for what he called "severe anomalies," which were edits that changed a driver log entry by ten to fifteen minutes or more. (Id. at PageID # 583.) When Harrill found such anomalies, he notified the transportation manager of the distribution center where the edits were made.[7] Harrill estimates that he shared anomalies with LaCourse between five and ten times during the audit.

After Harrill brought LaCourse's attention to an edit Cyr made to one of driver Jim Bennett's logs, LaCourse decided to investigate the edits being made at DC No. 1. At her deposition, LaCourse claimed that, in June 2016, she pulled a random sample of twenty to thirty

---

[5]  Plaintiff disputes that the 10:00 p.m. to 2:00 a.m. period was the busiest time of day and that DAT was hiring new drivers that needed to be trained during that period.

[6] The Court uses these alternative nomenclatures for this member of DAT's human resources department to avoid any confusion with the Plaintiff, who shares the same last name. Nothing in the record suggests any relation between Robert Cyr and Melissa Cyr.

[7]  At the time of Harrill's audit, DAT had nine different distribution centers.

edits made by all of her dispatchers for review.[8]  LaCourse also asserted that, through a review of the sampled edits, she identified seven occasions in which Cyr falsified a driver's log to avoid a DOT hours of service violation.[9]  By LaCourse's account, she then brought these seven edits to Southwick's attention.  On June 24, 2016, LaCourse and Southwick met with Cyr in Southwick's office to discuss LaCourse's findings.  During the meeting, LaCourse presented Cyr with a few examples of the allegedly inappropriate edits and asked him to explain them.[10]  However, given that Cyr had made hundreds of edits during the three weeks preceding the meeting, he was unable to recall exactly why he made the edits in question.  Cyr asked Southwick and LaCourse for an opportunity to research the edits so that he could explain them, but they declined his request. Southwick then placed Cyr on "administrative suspension" pending further investigation. (Southwick Dep. (ECF No. 24-6), PageID # 780).

After the June 24 meeting, Southwick contacted two transportation managers from other distribution centers, Francis Spera and Jeff Caldwell, about the edit investigation.  At his deposition, Southwick claimed that he spoke with Spera and Caldwell by phone and asked them to "look over the documentation . . . to look at the adjustments to see if they were outside the norm."  (Id.)  Although Southwick was unsure how Spera and Caldwell received LaCourse's documentation of Cyr's edits, he stated his belief that "they reached out to [LaCourse]" to get it.

---

[8]  As Plaintiff points out, however, she has provided no documentation of this random sample.

[9]  LaCourse attempted to explain why all seven edits were inappropriate at her deposition.  Specifically, although she could not remember why she deemed one of the seven edits to be suspect, she explained how: (1) each of the others changed a driver's on or off duty time such that the new time absolved the driver of an ostensible DOT hours of service violation, and (2) three of those six edits seemed to be in conflict with some piece of trip data such as a motion log or trip dispatch time.  (See LaCourse Dep. at PageID #s 642-643, 644-645, 646, 647, 649, 650; see also Def. SMF (ECF No. 23), PageID #s 113-116.)  Defendants now attempt to show how the seventh edit absolved a driver of a DOT violation, and was therefore suspect, by referencing the driver log edit detail report.  (See Def. SMF at Page ID #s 114-115; see generally LaCourse Dep. Ex. 1 (ECF No. 24-4).)

[10]  It is undisputed that LaCourse presented Plaintiff with his edits to the logs of drivers Trufant, Ahern, and Davis. Plaintiff claims that these were the only edits LaCourse showed him at the meeting.

(Id. at PageID # 783.)  Southwick also maintained that he contacted both transportation managers by phone more than once, that they each conducted research about edits being made at their own facilities, and that both informed him that Cyr's edits were outside the norm.  However, Spera and Caldwell remembered their involvement in the investigation differently: both denied doing any research or viewing any documentation, Spera stated that he only spoke to Southwick once, and Caldwell believed that Southwick only contacted him about XATA editing via e-mail.[11]  (See Defendants' Reply SMF (ECF No. 36), PageID # 1008; Spera Dep. (ECF No. 24-7), Page ID #s 812-813; Caldwell Dep. (ECF No. 23-1), PageID # 135.)

In addition to Spera and Caldwell, Southwick claimed that he spoke with Ken Harrill about Plaintiff's edits and that Harrill told him the edits constituted a "clear violation."  (Southwick Dep. at PageID # 784.)  As with Spera and Caldwell, Southwick "believe[d]" Harrill had seen LaCourse's documentation of Plaintiff's edits at the time Harrill made this determination.  (Id.)  Harrill, on the other hand, testified at his deposition that he was not "aware of any allegations of Mr. Cyr doing anything improper with regard to the editing of driving logs."  (Harrill Dep. at PageID # 609.)  Southwick also "believe[d]" that LaCourse contacted other employees who edited driver logs such as Rob Blais, "maybe" Karen Jensen, and "probably" Diane Chretian as part of the investigation.[12]  (Southwick Dep. at Page ID # 784.)  For her part, however, LaCourse recalled that she only spoke to Southwick, Harrill, and Ms. Cyr during the inquiry.[13]  There is also is no

---

[11]  The Court also notes that during the discovery process, Plaintiff sent Defendants a request for copies of any edits reviewed by Spera and Caldwell.  In response, Defendants admitted that no such documents exist.

[12]  Southwick further stated that although he "know[s] there was some follow-up done with those folks," meaning other DC No. 1 employees who edited the driver logs, he does not actually know who LaCourse spoke with specifically.  (Southwick Dep. at PageID # 784.)

[13]  Because Melissa Cyr worked in human resources, Southwick and LaCourse kept Ms. Cyr "apprised" of the investigation into Plaintiff's edits.  (M. Cyr Dep. (ECF No. 23-2), PageID # 152.)

indication in the record that either Southwick or LaCourse spoke to any of the drivers whose logs were at issue during their investigation.

On June 27, Cyr sent Melissa a letter in which he wrote, *inter alia*, that "I assume that I have been specifically targeted and audited for reasons that I've shared with Melissa at our last meeting." (Cyr Dep. Ex. 1 (ECF No. 30-5), PageID # 887.) On June 29, Melissa called Cyr who again opined that DAT was discriminating against him based on his age.[14] Then, on July 8, 2016, Cyr met with Southwick and Melissa. At that point, Southwick terminated Cyr for "falsifying" driver logs in violation of company policy.[15] (Southwick Dep. at PageID # 787.) Thereafter, LaCourse informed Spera, whose distribution center worked closely with DC No. 1, that Cyr had been terminated for falsifying documents. Cyr himself did not tell anyone of the stated reason for his termination. DAT then transferred a thirty-eight-year-old warehouse supervisor, Lucas Peterson, to DC No. 1 to become a supervisor. On July 25, 2016, Cyr wrote a letter to appeal his termination. (R. Cyr Dep. Ex. 20 (ECF No. 23-11), PageID #s 554-559.) In response, DAT offered Cyr a severance package. Cyr rejected that offer and ultimately initiated the current litigation.[16]

### III.    DISCUSSION

Plaintiff alleges that Defendants violated the Maine Human Rights Act ("MHRA") by retaliating against him for complaining of age discrimination (Count I); and discriminating against

---

[14]  Plaintiff claims, citing his deposition testimony, that Ms. Cyr made this phone call to discuss issues raised in the June 27 letter. However, Defendants disagree and cite Ms. Cyr's testimony that she did not become aware of the June 27 letter until she received a copy at the July 8 meeting at which Southwick terminated Plaintiff.

[15]  It is undisputed that: (1) falsification of company documents may result in an employee's termination pursuant to both DAT's Personal Behavior Policy and DAT's Performance Counseling Policy; (2) Plaintiff was aware of and understood both of those policies; and (3) the Performance Counseling Policy required a human resources representative to review the discharge decision before termination.

[16]  Through his deposition and affidavit, Plaintiff attempted to justify his allegedly suspect edits. In doing so, he addressed the record conflicts LaCourse cited as part of her rationale for why some of the edits were false, and at least created a dispute of material fact as to whether he made all the edits in a good-faith effort to ensure the logs' accuracy. (See R. Cyr. Dep. at PageID #s 459-463, 466-467, 470-472; Pl. Aff. (ECF No. 30-2), PageID # 865; see also Pl. Response SMF (ECF No. 31), PageID #s 904-910.)

him based on his age (Count II).  Plaintiff also contends that Defendants committed defamation and slander per se by publicizing false accusations that he falsified records.  (Counts III and IV).  As Defendants seek summary judgment on all counts, the Court addresses each count in turn.

**A.  MHRA Claims**

"Maine courts apply the MHRA in accordance with federal anti-discrimination law." Forrest v. Brinker Int'l Payroll Co., LP, 511 F.3d 225, 228 n.1 (1st Cir. 2007).  Where, as here, a plaintiff has no direct evidence of retaliation or age discrimination, the plaintiff may still survive summary judgment through the *McDonnell Douglas* burden shifting framework.  Mesnick v. Gen. Elec. Co., 950 F.2d 816, 823, 827 (1st Cir. 1991) (noting that *McDonnell Douglas* "remains the option of choice in retaliation cases, albeit with slight modifications").  Generally, under this framework, a plaintiff alleging retaliation or age discrimination must first establish a prima facie case.  Id.  The burden at this stage is not high.  Che v. Mass. Bay Transp. Auth., 342 F.3d 31, 38 (1st Cir. 2003); Mesnick, 950 F.2d at 823.  Once the plaintiff has made the proper showing, the burden of production shifts to the defendant who, depending on the type of claim, must articulate a legitimate, non-retaliatory or non-discriminatory reason for the job action at issue.  Collazo v. Bristol-Myers Squibb Mfg., Inc., 617 F.3d 39, 46 (1st Cir. 2010); Mesnick, 950 F.2d at 823.  If the defendant is successful, the burden reverts to the plaintiff who must "offer some minimally sufficient evidence" that the proffered reason is pretext and that the employer acted with the relevant animus—retaliatory or discriminatory.  Mesnick, 950 F.2d at 825, 827.

**1.  Retaliation**

"To establish a prima facie case of retaliation under the MHRA, [the plaintiff] must show that: (1) he engaged in protected conduct under the statute; (2) he suffered an adverse employment action; and (3) a causal connection existed between the protected conduct and the adverse action."

Bishop v. Bell Atl. Corp., 299 F.3d 53, 58 (1st Cir. 2002). Defendants concede for purposes of this Motion, that Plaintiff has established a prima facie case of retaliation. Likewise, as to the second stage, it is undisputed that Defendants' stated reason for firing Plaintiff—that he falsified driver logs—constitutes a "legitimate, non-retaliatory reason for [the employer's] employment decision." Collazo, 617 F.3d at 46. Thus, the Court proceeds to the third stage of the *McDonnell Douglas* framework, which requires Plaintiff to produce evidence that the job action at issue "was the result of the defendant[s'] retaliatory animus." Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 26 (1st Cir. 2004); see Fennell v. First Step Designs, Ltd., 83 F.3d 526, 536 (1st Cir. 1996) (noting that the "dispositive question" at the third stage is whether the plaintiff has "established genuine issues of fact that (1) [the employer's] business reasons were a pretext and (2) [the adverse action] was in retaliation for" protected activity).

To meet this burden as to retaliatory animus, the plaintiff must demonstrate that "the decisionmaker knew of the plaintiff's protected conduct when he or she decided to take the adverse employment action." Pomales v. Celulares Telefonica, Inc., 447 F.3d 79, 85 (1st Cir. 2006). "The reasons underlying such a requirement are obvious: if a supervisor or other employee is unaware of the fact that a plaintiff engaged in protected conduct, any actions attributable to him could not plausibly have been induced by retaliatory motives." Alvarado v. Donahoe, 687 F.3d 453, 459 (1st Cir. 2012).

Here, the Court discerns no evidence, direct or otherwise, from which a jury could infer that either of Plaintiff's alleged retaliators, Southwick and LaCourse, knew that Plaintiff had complained to Ms. Cyr prior to the July 8 termination meeting.[17] Southwick testified that he was

---

[17] As far as the Court can tell, Southwick carried out the only two allegedly adverse actions that occurred after Plaintiff's first age discrimination complaint: the suspension and termination.

unaware of Plaintiff's complaints until after the termination. (Southwick Dep. at PageID # 779.) Although no one asked LaCourse at her deposition if or when she became aware of Plaintiff's complaints, there is no evidence in the record that anyone told her about them prior to the termination. (See R. Cyr Dep. at PageID # 415 (stating that he only complained to Melissa Cyr); M. Cyr Dep. (ECF No. 23-2), PageID # 156 (noting that she told her boss, Jeremy Larman, of at least one of Plaintiff's complaints, but never indicating that she told anyone else).) Despite this, Plaintiff asserts that because Southwick and LaCourse kept Ms. Cyr updated on their investigation, Ms. Cyr, in turn, "would have" informed them of Plaintiff's complaints. (Pl. Response SMF (ECF No. 31), PageID # 900.) Such speculation is insufficient to survive summary judgment.[18] See Medina-Rivera v. MVM, Inc., 713 F.3d 132, 140 (1st Cir. 2013) (affirming summary judgment where Plaintiff stated only that she "imagine[d]" her supervisor was aware of protected conduct); Alvarado, 687 F.3d at 460 (affirming summary judgment where Plaintiff stated, without more, that alleged retaliators "should have known" of protected conduct).

The earliest time that either Southwick or LaCourse could have become aware of Plaintiff's complaints to Ms. Cyr, based on the evidence in the record, was when Southwick received Plaintiff's June 27 letter at the termination meeting. However, this letter did not explicitly indicate that Plaintiff had engaged in protected activity, but merely that he had complained to HR that he believed he was being targeted. Even assuming, *arguendo*, the Court could infer that Southwick read the letter before terminating Plaintiff, such an inference would not permit a finding that Plaintiff's protected activity was the but-for cause of Southwick's decision to terminate Plaintiff.

---

[18] Plaintiff further asserts that because it was DAT policy to investigate claims of discrimination, Southwick "would have been" apprised of Cyr's complaint in May or June prior to the termination. (Pl. Response SMF at PageID # 900.) However, there is no evidence that such investigations required or even normally involved informing the alleged discriminator of a complaint, let alone that Ms. Cyr or anyone else spoke to Southwick about it. Thus, this assertion similarly falls into the category of "rank speculation" that cannot deflect summary judgment. Wilson, 639 F.3d at 6.

See Mesnick, 950 F.2d at 826 (noting that a district court is "under no obligation to draw unreasonably speculative inferences"); see also Roy v. Correct Care Sols., LLC, 914 F.3d 52, 70 (1st Cir. 2019) ("The causation element of a Title VII retaliation claim is not satisfied by evidence that retaliation was one motivating factor in the adverse action.")

### 2. Age Discrimination

A successful prima facie case of age discrimination requires a showing that: "(i) the plaintiff was over the age of forty, (ii) his work was sufficient to meet his employer's legitimate expectations, (iii) his employer took adverse action against him, and (iv) the employer sought a replacement with roughly equivalent job qualifications, thus revealing a continued need for the same services and skills." Mesnick, 950 F.2d at 823. Assuming the evidence satisfies these four requirements, the Court then considers whether Defendants have presented evidence of a valid basis for the adverse action. If such evidence is produced, the Court proceeds to the third stage of the McDonnell Douglas framework. In this final step, "[i]t is not enough for a plaintiff merely to impugn the veracity of the employer's justification; he must 'elucidate specific facts which would enable a jury to find that the reason given is not only a sham, but a sham intended to cover up the employer's real motive: age discrimination.'" Id. at 824 (quoting Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 9 (1st Cir. 1990)).

Focusing first on Plaintiff's prima facie case of age discrimination, the parties appear to initially dispute what qualifies as an adverse action for purposes of Cyr's age discrimination claim. Plaintiff asserts there is evidence "of a series of adverse actions . . . including the change in Cyr's hours, the meritless PIP, the threat of termination, the suspension and the termination." (Pl. Response to Def. Mot. (ECF No. 32), PageID # 956.) Though Defendants concede that Plaintiff's

termination qualifies as an adverse action in the age discrimination context, they argue that none of the other allegedly adverse actions do.

On this point, the Court agrees with Defendants. An adverse action, for purposes of an age discrimination claim, is one that "materially change[s] the conditions of plaintiffs' employ." Gu v. Boston Police Dep't, 312 F.3d 6, 14 (1st Cir. 2002). Such actions "typically involve[] discrete changes in the terms of employment, such as 'hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits.'" Morales-Vallellanes v. Potter, 605 F.3d 27, 35 (1st Cir. 2010) (quoting Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998)). "A materially adverse change . . . 'must be more disruptive than a mere inconvenience or alteration of job responsibilities.'" Id. (quoting Marrero v. Goya of P.R., Inc., 304 F.3d 7, 23 (1st Cir. 2002)). This determination requires an "objective," case-by-case inquiry. Blackie v. Maine, 75 F.3d 716, 725 (1st Cir. 1996).

Apart from Plaintiff's termination, none of the allegedly adverse actions Plaintiff cites— the cold shoulder treatment, cancellation of his project without consultation, the PIP, the suspension, or the change in hours—meet this standard. Southwick's cold shoulder treatment did not amount to anything other than inconvenience for Plaintiff. See Charette v. St. John Valley Soil & Water Conservation Dist., 332 F. Supp. 3d 316, 350 (D. Me. 2018) (noting that increased animus or hostility is insufficient absent change in work duties or conditions). Likewise, there is no evidence that Southwick's lack of consultation in cancelling Plaintiff's project ran afoul of any "objective" terms or conditions of his employ. Blackie, 75 F.3d at 725. Plaintiff failed to show, for example, that he was entitled to such consultation or even that Southwick customarily consulted him when making such decisions. Moreover, LaCourse's request that Plaintiff re-structure his schedule cannot be considered sufficiently "disruptive" given that Plaintiff was the evening

supervisor, had only recently begun to shift his hours to the daytime, and was able to call in for Tuesday morning safety meetings. Morales-Vallellanes, 605 F.3d at 35 (quoting Marrero, 304 F.3d at 23).

As for the PIP, rather than enacting a change to the terms or conditions of Plaintiff's employment, it constituted a written reprimand "directed at correcting [Cyr's] workplace behavior." Bhatti v. Trs. of Bos. Univ., 659 F.3d 64, 73 (1st Cir. 2011) (finding that reprimands without "any tangible consequences" and "merely directed at correcting some workplace behavior" were not adverse even under the broader definition of material adversity in the retaliation context). Finally, the Court concludes that the suspension was not adverse. Plaintiff produced no evidence that the suspension docked him pay or benefits or changed any other term or condition of his employ. See Joseph v. Leavitt, 465 F.3d 87, 91 (2d Cir. 2006) (holding in agreement with several other circuits that "an employee does not suffer a materially adverse change in the terms and conditions of employment where the employer merely enforces its preexisting disciplinary policies" such as administrative leave).

Thus, the Court concludes that the only adverse action that satisfies the prima facie requirements for Plaintiff's age discrimination claim is his termination. Because the parties do not genuinely dispute that the other elements of Plaintiff's prima facie case are satisfied, the Court's inquiry moves to the second stage. There, Defendants have met their "burden of production" by presenting evidence that Southwick fired Cyr for falsifying driver logs in violation of company policy. Mesnick, 950 F.2d at 823. Thus, the Court turns its attention to the third stage of the *McDonnell Douglas* framework.

At the third stage, as noted above, Plaintiff must show that the stated reason for the adverse action is a "sham" intended to cover up age discrimination. Mesnick, 950 F.2d at 824 (quoting

Medina-Munoz, 896 F.2d at 9). As to the sham aspect, "the focus is on the mindset of the actual decisionmaker" who the Plaintiff must show "did not believe in the accuracy of the reason given for the adverse employment action." Kouvchinov v. Parametric Tech. Corp., 537 F.3d 62, 67 (1st Cir. 2008). Such lack of belief may be demonstrated through "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons." Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 56 (1st Cir. 2000) (internal citations and quotations omitted). To show discriminatory animus, a plaintiff may mine several "veins of circumstantial evidence," including disparaging age-based comments and the hiring of younger replacements. Mesnick, 950 F.2d at 824. The pretext inquiry is "heavily fact-specific," Sabinson v. Trs. of Dartmouth Coll., 542 F.3d 1, 5 (1st Cir. 2008), and, once a court reaches it, that court must be "'particularly cautious' about granting the employer's motion for summary judgment." Hodgens v. General Dynamics Corp., 144 F.3d 151, 167 (1st Cir. 1998) (quoting Stepanischen v. Merchs. Despatch Transp. Corp., 722 F.2d 922, 928 (1st Cir.1983)). Here, in view of the "totality of the circumstances," the Court concludes that there is a dispute of material fact as to whether Defendants' stated reason for the termination was pretext for age discrimination. Goldman v. First Nat. Bank of Bos., 985 F.2d 1113, 1119 (1st Cir. 1993).

Initially, the Court notes that Plaintiff has produced evidence of pretext. First, the record reveals numerous contradictions between Southwick's account of the edit investigation and the accounts of others. For example, neither Spera nor Caldwell recalled viewing documentation of Plaintiff's edits or conducting independent edit research, countering Southwick's suggestions otherwise; Spera contravened Southwick's claim that he spoke with Spera about the edits more than once; Caldwell contradicted Southwick's assertion that he communicated with Caldwell about the edits by phone; Harrill raised doubt that Southwick ever contacted him about Plaintiff's edits;

and LaCourse's account conflicted with Southwick's belief that LaCourse spoke to DC No. 1 dispatchers other than Plaintiff.

One plausible interpretation of these myriad contradictions is that Southwick—the key decisionmaker—misrepresented the breadth of his inquiry to mask that it never actually convinced him of Plaintiff's guilt, and that he fired Plaintiff for a different reason. See Ronda-Perez v. Banco Bilbao Vizcaya Argentaria-P.R., 404 F.3d 42, 45 (1st Cir. 2005) (internal citations and quotations omitted) (defining pretext as "deceit used to cover one's tracks"). Those contradictions, together with the evidence that Southwick never interviewed any other dispatchers at DC No. 1 or any of the drivers involved, and refused to allow Plaintiff to research the edits, would allow a fact finder to infer that the inquiry was a pre-ordained sham. See Fairweather v. Friendly's Ice Cream, LLC, no. 2:13-cv-00111-JAW, 2014 WL 3699489, at *26 (D. Me. 2014) (noting that cursory nature of the decisionmaker's investigation permitted an inference of pretext); see also Ahmed v. Johnson, 752 F.3d 490, 502 (1st Cir. 2014) (observing in hiring discrimination context that failure to seek out all pertinent information about a candidate can support inference of pretext). The "sudden emergence" of Plaintiff's performance issues—only after Southwick became Plaintiff's supervisor—lends further credence to this theory. Phair v. New Page Corp., 708 F. Supp. 2d 57, 67 (D. Me. 2010) (quoting Zapata-Matos v. Reckitt & Colman, Inc., 277 F.3d 40, 47 (1st Cir. 2002)). Such a combination of circumstantial evidence is at least "minimally sufficient" to support a finding that Southwick's stated reason for Plaintiff's termination was pretext. Mesnick, 950 F.2d at 825.

Plaintiff has also produced evidence that, considered in the "aggregate," would allow a jury to find that Southwick's real reason for terminating Plaintiff was his advanced age. Id. at 824. It is well-settled that discriminatory comments by supervisors and decisionmakers can constitute

evidence of discriminatory animus. Hodgens, 144 F.3d at 171 ("[s]tatements by supervisors carrying the inference that the supervisor harbored animus against protected classes of people or conduct are clearly probative of pretext"); Kelley v. Airborne Freight Corp., 140 F.3d 335, 347 (1st Cir. 1998) (explaining that "statements made by decisionmakers can evidence age discrimination"). That said, the First Circuit has also indicated that the probative value of such comments is circumscribed if "they were made in a situation temporally remote from the date of the employment decision or if they were not related to the employment decision in question or were made by nondecisionmakers." McMillan v. Mass. Soc. For Prevention of Cruelty to Animals, 140 F.3d 288, 301 (1st Cir. 1998) (internal citations omitted); see Gonzalez v. El Dia, Inc., 304 F.3d 63, 69 (1st Cir. 2002) (explaining that remarks fitting into these three categories "normally are insufficient, standing alone, to establish . . . the requisite discriminatory animus").

Here, it is difficult to interpret Southwick's "dinosaur age related theories" comment as anything other than disdainful of Plaintiff's advanced age. (R. Cyr Dep. at PageID # 387.) Moreover, this comment is highly probative of discriminatory animus because: (1) the decisionmaker in Plaintiff's termination made it, (2) it was temporally proximate to that adverse action, and (3) it was causally connected to that adverse action. The first factor is self-explanatory. As to the second, discriminatory statements made within six months of an adverse action can be considered temporally proximate to that action. Acevedo-Parrilla v. Novartis Ex-Lax, Inc., 696 F.3d 128, 144 (1st Cir. 2012). Regarding the third, "draw[ing] all reasonable inferences" in Plaintiff's favor, Southwick's comment evinced a belief that Plaintiff's age had diminished his value to the company. Garcia-Garcia, 878 F.3d at 41. A jury could thus conclude that the comment was causally related to Plaintiff's termination. See Acevedo-Parilla, 696 F.3d at 144 (concluding

that remark indicating decisionmaker's "displeasure at older employees' long tenure at the company" could be "causally related" to the plaintiff's later discharge).

On top of this highly probative comment, the record reveals two other pieces of evidence that could help support a finding of discriminatory animus. First, "the deployment of younger replacements" can serve as evidence of age discrimination. Mesnick, 950 F.2d at 824. Here, there is evidence that DAT replaced Plaintiff with someone about twenty years Plaintiff's junior who, at age thirty-eight, was outside the protected category. See Hebert v. Mohawk Rubber Co., 872 F.2d 1104, 1115 (1st Cir. 1989) (citing the fact that the employer replaced the plaintiff with a younger person as evidence of age-based animus). Second, "[p]roof that the defendant's explanation is unworthy of credence is . . . [another] form of circumstantial evidence that is probative of intentional discrimination." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147 (2000). In fact, a "'a suspicion of mendacity' may be particularly influential to a jury's determination of . . . intentional discrimination." Velez v. Thermo King de P.R., Inc., 585 F.3d 441, 452 (1st Cir. 2009) (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511 (1993)). In the instant case, Southwick's testimony permits such a suspicion, and, therefore, could lend further support to a finding of age discrimination. See id. All told, Plaintiff has produced sufficient evidence of pretext and age discrimination to survive summary judgment on this claim.

**B. Defamation Claims**

Defendants lastly move for summary judgment as to Plaintiff's claims for defamation and slander per se. In his Complaint, Plaintiff alleges that Defendants "falsely accused Plaintiff of falsifying documents" and published that accusation through "inter-company communications." (Compl. (ECF No. 4-2), PageID #s 21-22.)[19] Defendants now argue that these claims fail as a

---

[19] To the extent that Plaintiff's Complaint alternatively asserted a defamation claim based on "forced self-publication," Defendants argue that "Plaintiff has failed to identify any instance of forced self-publication of the reason for his

matter of law because: (1) the "inter-company communications" involving any accusation that Defendant falsified documents are protected by conditional privilege; and (2) neither Southwick nor LaCourse abused the privilege.

"The elements of a defamation claim under Maine law are '(a) a false and defamatory statement concerning another; (b) an unprivileged publication to a third party; (c) fault amounting at least to negligence on the part of the publisher; and (d) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication.'" Porietis v. Tradesmen Int'l, LLC, 227 F. Supp. 3d 126, 140 (D. Me. 2017) (quoting Lester v. Powers, 596 A.2d 65, 69 (Me. 1991)). In Maine, a conditional privilege "may arise 'in any situation in which an important interest of the recipient of a defamatory statement will be advanced by frank communication.'" Cole v. Chandler, 752 A.2d 1189, 1193 (Me. 2000) (quoting Rippett v. Bemis, 672 A.2d 82, 87 (Me. 1996)). Once a court determines that the privilege applies, "the burden shifts to the plaintiff 'to come forward with evidence that could go to a jury that [the defendant] abused the privilege.'" Id. at 1194 (quoting Gautschi v. Maisel, 565 A.2d 1009, 1011 (Me. 1989)).

Here, in his one-paragraph rebuttal of Defendants' arguments seeking dismissal of his defamation claim, Plaintiff reasonably appears to concede that conditional privilege applies to any "inter-company communications" in the record that involve an accusation that Cyr falsified documents. See Morgan v. Kooistra, 941 A.2d 447, 456 (Me. 2008) (citing rule that "statements made in the course of an investigation into an employee's actions for disciplinary purposes are conditionally privileged"); Onat v. Penobscot Bay Med. Ctr., 574 A.2d 872, 874 (Me. 1990) (finding statements made during the plaintiff doctor's peer review process, to which the plaintiff

---

termination." (Def. Mot. at PageID # 104.) Plaintiff has offered no evidence or rebuttal in response to this argument. Thus, the Court limits its discussion to the "inter-company communications" theory.

"voluntarily subjected himself" as a hospital employee, to be conditionally privileged).[20] However, Plaintiff argues that Southwick and LaCourse abused the privilege.

Whether a speaker abused the privilege is a question of fact. Cole, 752 A.2d at 1194. Abuse includes a false statement made "with malicious intent." Id. Malicious intent exists if the speaker "knows his statement to be false, recklessly disregards its truth or falsity, or acts with spite or ill will." Id. (internal citations and quotations omitted). Reckless disregard "can be proved by evidence that establishes that the maker of a statement had a high degree of awareness of probable falsity or serious doubt as to the truth of the statement" at the time it was made. Id. (internal citations and quotations omitted). However, the Law Court has also held that "[i]nadequate investigation into the truth of the statement is not enough to establish malice." Morgan, 941 A.2d at 456. Based on Plaintiff's minimal briefing and failure to clearly identify the statements by Southwick and LaCourse that he alleges were defamatory, the Court simply fails to see any trialworthy evidence that would allow a fact finder to conclude that they made any of their statements related to Cyr's termination with the requisite malice.

Likewise, Plaintiff has not proffered trialworthy evidence that Southwick or LaCourse published false statements regarding Cyr "*solely* out of spite or ill-will." Lester, 596 A.2d at 70. The Law Court has explained that to show abuse of privilege through ill-will, the record must support that the alleged defamatory statement was made "*solely* out of spite or ill-will and not to further [the interest on which the privilege was grounded]." Id. Here, Plaintiff has produced no evidence from which a jury could infer that LaCourse harbored any ill-will towards Plaintiff.

---

[20] The Court notes that Maine law is somewhat unique in recognizing intra-corporate communications as third-party publications. See Staples v. Bangor Hydro-Electric Co., 629 A.2d 601, 603-604 (Me. 1993) (noting that "a substantial number of jurisdictions [hold] . . . that a corporation acting through one of its agents to send a defamatory communication to another of its agents is simply communicating with itself" but explaining why it chooses to recognize such communications as publications). However, the Law Court has also indicated that having "the defense of qualified privilege provides adequate protection" for corporate employers facing defamation claims from employees for internal communications. Id. at 604.

Neither has he demonstrated that Southwick ever made a defamatory statement "solely" out of ill-will. Id. The Court discerns only one instance in the record where Southwick explicitly accused Plaintiff of falsifying records: the termination meeting. The evidence reflects that this meeting was a part of DAT's investigatory and discharge processes and that the statement regarding document falsification was made to advance these processes. See id. (affirming grant of summary judgment where there was evidence that speaker had harbored ill-will towards the plaintiff in the past, but record did not support finding that statements at issue were made solely out of ill-will and not to advance "tenure review process").

As a result, the Court GRANTS Defendants' Motion as to Counts III & IV.

**IV.     CONCLUSION**

Based on the foregoing, the Court GRANTS Defendants' Motion as to Plaintiff's retaliation and defamation claims (Counts I, III, and IV) and DENIES the Motion as to Plaintiff's age discrimination claim (Count II).

SO ORDERED.

/s/ George Z. Singal
United States District Judge

Dated this 12th day of March, 2019.